CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

SEP 17 2008

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| HINKLE OIL & GAS, INC., | ) |
| | ) Civil Action No.: 7:07cv00487 |
| Plaintiff | ) |
| | ) |
| v. | ) MEMORANDUM OPINION |
| | ) |
| | ) By: Samuel G. Wilson |
| BOWLES RICE MCDAVID | ) United States District Judge |
| GRAFF & LOVE LLP, JULIA | ) |
| CHINCHECK, CHARLES DOLLISON, | ) |
| MARC MONTELEONE, AND | ) |
| GERARD STOWERS, | ) |
| | ) |
| Defendants. | ) |

This is a diversity action for tortious interference, legal malpractice, breach of fiduciary duty, and conversion by Plaintiff, Hinkle Oil & Gas, Inc. ("Hinkle"), against Defendants Bowles Rice McDavid Graff & Love LLP ("Bowles Rice"), a West Virginia law firm partnership, and against four members of that firm individually, Julia Chincheck, Charles Dollison, Marc Monteleone, and Gerald Stowers.[1] Hinkle retained Bowles Rice to represent it in the acquisition of a bankrupt debtor's oil and gas wells in Kentucky. Hinkle maintains, and the record is clear, that two of the individual Defendants, Dollison and Monteleone, formed a corporation to acquire the same oil and gas wells that Hinkle was attempting to acquire. The record is equally clear that Dollison and Monteleone ceased their efforts to obtain the wells and that ultimately a third-party simply outbid Hinkle and acquired them. The matter is currently before the court on cross-motions for summary judgment. The court concludes that Hinkle cannot show it was unable to acquire the wells because of anything Dollison and Monteleone did or failed to do, an essential

---

[1] The case was initially filed in the Western District of Oklahoma and transferred here by agreement of the parties.

element of Hinkle's tortious interference, breach of fiduciary duty, and legal malpractice claims. The court also concludes that Hinkle's evidence does not establish an actionable conversion. Accordingly, the court will grant summary judgment for Defendants. However, the court will grant Hinkle leave to assert, if it is able, any claim not predicated on its failure to obtain the Kentucky oil and gas wells.

## I.

The court considers the facts in the light most favorable to Hinkle.

As early as 1997, Hinkle, an Oklahoma corporation, and its sister company, Minerals Management Group, Inc. ("MMGI"), became involved in legal disputes over two oil wells with competitor Buffalo Properties ("Buffalo"), the owner of land, oil, and gas wells in West Virginia and Kentucky. The case was in Kentucky state courts until 2004, when Buffalo filed for Chapter 11 bankruptcy protection in the United States District Court for the Southern District of West Virginia. MMGI filed an adversary proceeding regarding the two disputed wells. The bankruptcy court converted the Chapter 11 bankruptcy to a Chapter 7 bankruptcy in 2005.

Hinkle and the trustee, Robert Johns, negotiated a plan under which Hinkle would buy Buffalo's nineteen wells in Kentucky for $400,000 and dismiss MMGI's state court action. The trustee agreed to move the bankruptcy court to approve the sale, once the matter was finalized. At that time, no other prospective bidders were considering the Kentucky wells as a separate purchase. The nineteen Kentucky wells represented only a portion of Buffalo's holdings, which also included 274 wells in West Virginia. The trustee had received at least one offer for all of Buffalo's holdings before the negotiations between Hinkle and the trustee.

In spring 2006, the trustee's attorney sent Hinkle a proposed contract for the sale of the Kentucky wells for $400,000. Hinkle contacted Julia Chincheck, a Bowles Rice partner, seeking

2

to retain her to complete the contract negotiation and obtain bankruptcy court approval. Chincheck circulated a written conflict memorandum to all Bowles Rice attorneys, explicitly mentioning Hinkle and Buffalo. No one at Bowles Rice noted a conflict. Hinkle paid a $5000 retainer, and Chincheck undertook the representation.

Chincheck commenced negotiations with the trustee. Though the parties were in active negotiation, they were only discussing warranties and no contract had been signed as of May 22, 2006. The trustee had substantive disagreements with Hinkle's proposed contract, and the trustee was negotiating with at least one other party. During a meeting on May 25, 2006, the trustee told Chincheck that Buffalo had entered into a written contract to sell the Kentucky wells for $450,000 to Elk River Energy, LLC ("Elk River"). Paul Soares, an agent of Hinkle, investigated the buyer and soon learned that two Bowles Rice partners, Charles Dollison and Marc Monteleone, had very recently organized Elk River and owned it along with a friend. Even before Elk River was formed, Dollison knew it was a conflict of interest to pursue the Kentucky wells while his partner, Chincheck, was working on Hinkle's behalf. When the trustee's attorney advised Dollison of the conflict, Dollison said "[d]on't worry, I'll take care of it," and continued with the sale.

When the conflict became apparent, Soares suggested that Elk River mitigate any potential harm to Hinkle by assigning its contract and paying Hinkle the $50,000 difference between the Elk River contract price and Hinkle's offer. Chincheck and Dollison met with Gerard Stowers, a Bowles Rice partner in charge of risk management, and decided that Bowles Rice would cease representation of Hinkle and Elk River would pull out of its agreement with the trustee.

On June 2, 2006, Chincheck advised Hinkle to find new counsel. Shortly after, Hinkle's

3

new counsel, Hugo Gerstl, wrote to Bowles Rice seeking to mitigate damages. Bowles Rice responded by withdrawing from representation of Hinkle. Bowles Rice did not, and still has not, returned the $5000 retainer; it has sent Hinkle neither a bill nor an accounting.

The trustee moved the bankruptcy court to approve the Elk River contract, and set June 14 as the date for objections or upset bids. On June 9, Hinkle filed an upset bid of $455,000 and sent the required $25,000 earnest money to the trustee. Elk River objected to its own contract. At this time, the trustee had moved the court for the approval of two sales – one for the West Virginia wells the other for the Kentucky wells. Both proposed sales faced objections; Elk River objected to its own sale and an unrelated creditor objected to the West Virginia sale. On July 3, First South Investments wrote Judge Pearson seeking to purchase all the assets for $2.5 million. (Def.'s Reply Supp. Summ. J., Ex. B.)

On July 17, the bankruptcy court ordered the trustee to propose "alternative sale procedures" in which the wells would be auctioned both separately and together so that the estate could accept the highest overall bid. The court's order noted that at least two parties "had expressed interest in acquiring all of the assets of [Buffalo] for substantially more than the total of the highest existing bids for the West Virginia [wells] and the Kentucky [wells]." In re Buffalo Properties, LLC, No. 04-30404 (Bankr. S.D. W. Va. July 17, 2006). The order did not mention Elk River, Hinkle or Bowles Rice; its stated reasons were focused solely on selling Buffalo's wells so as to maximize recovery by permitting prospective purchasers to bid on all or specific portions of the assets. The order sustained the objection to the West Virginia sale and allowed any party that had previously submitted an offer to withdraw from the bid process. The order also "terminated in all respects" the Elk River contract. Id.

The court approved the alternative sale procedures, allowing the trustee to sell the West

4

Virginia and Kentucky wells either separately or together. This style of auction is a common mechanism in bankruptcy proceedings, and the trustee believed it was the best way to maximize the return to the bankruptcy estate. (Johns Dep. 137.) Hinkle objected to the alternative sale procedures, but the bankruptcy court overruled the objections.

At the auction, Hinkle bid $500,000, and was the high bidder for the Kentucky wells. Elk River did not bid. A third party bid $2 million, and was the high bidder for the West Virginia wells. An entity named Heritage Financial Group, Inc. ("Heritage") bid $7 million for the combined properties; it was the overall high bidder. Hinkle unsuccessfully objected to the sale of the properties to Heritage. Hinkle also tried to contact Heritage after the auction, but by then Heritage was defunct. Heritage had conveyed Buffalo's assets to an entity named Mountain Country Partners. Bowles Rice represented Mountain Country Partners after the auction was complete, performing title work on wells that formerly belonged to Buffalo.

Hinkle now brings suit against Bowles Rice and four Bowles Rice partners, Dollison, Monteleone, Chincheck, and Stowers, alleging the following claims: (1) intentional interference with business expectancy (against all Defendants except Chincheck and Stowers); (2) breach of fiduciary duty (against all Defendants except Chincheck and Stowers); (3) professional negligence (legal malpractice) (against all Defendants); and (4) conversion and/or misappropriation of proprietary property and funds (against all Defendants except Chincheck). Hinkle seeks more than $25 million in compensatory damages, attorney's fees, and the $5000 paid to Bowles Rice.[2] The matter is before the court on the parties' cross-motions for summary

---

[2] Hinkle originally brought several other claims, but Hinkle has abandoned them.

judgment.[3]

## II.

Hinkle's tortious interference, legal malpractice and breach of fiduciary duty claims share the same element of causation: Hinkle must show it was unsuccessful in obtaining the wells because of Defendants' conduct, not because a third party outbid it. To make that showing, Hinkle claims that but for Defendants' conduct, it would have finalized a bid for the Kentucky wells separately and received the bankruptcy court's *pro forma* approval. Alternatively, Hinkle contends that had Elk River simply pursued approval of its own agreement rather than object to its own agreement, the bankruptcy court would have approved the sale as a matter of course, and Elk River could have assigned its interest to Hinkle. Hinkle theorizes that either it or Elk River would have been able to purchase the Kentucky wells separately because the bankruptcy court would have made no effort to do what in fact did: bundle the Kentucky and West Virginia wells to fulfill the bankruptcy court's obligation to maximize the bankruptcy estate's recovery. The court rejects Hinkle's theory on two interrelated grounds. First, Hinkle's theory incorrectly presupposes a disengaged, or even indifferent, bankruptcy court that is little more than a bystander, incapable of independently recognizing how to maximize the bankruptcy estate's recovery. Second, it requires the fact-finder to speculate that, given a slightly different timing and sequence of events, the bankruptcy court would have done something different than what it

---

[3]Summary judgment is granted only "if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are viewed in the light most favorable to the non-moving party. See Lee v. York County Sch. Div., 484 F.3d 687, 693 (4th Cir. 2007). To withstand a summary judgment motion, the non-moving party must offer evidence from which a fair-minded jury could return a verdict for the party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). This standard applies to each of the four claims at issue here.

6

in fact did. Accordingly, the Court enters summary judgment for Defendants because Hinkle cannot prove Defendants' conduct caused its failure to obtain the wells.

"It is a well-established principle of bankruptcy law that the objective of bankruptcy sales and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). To achieve this objective, sales, other than in the ordinary course of business, are subject to court approval only after notice and a hearing. See 11 U.S.C. § 363(b) (2000). To be sure, "bankruptcy courts have consistently respected the importance of the trustee's managerial functions and have abstained from any interference that would not seem indispensable for the purpose of safeguarding the interests of parties concerned." In re Blue Coal Corp., 59 B.R. 157, 160 (Bankr. M.D. Pa. 1986). But the bankruptcy court's role is far from *pro forma* or even supervisory: "the powers reserved to the courts to direct the time and manner of a sale and to confirm it or to order a resale are of such a nature that they can scarcely be termed to be 'supervisory only'. 'The bankruptcy court is in fact the vendor . . . .'" Id. (citations omitted).

With these principles in mind, the court concludes that the best, and indeed only, indication of what the bankruptcy court would have done is what it in fact did: recognize that alternative sale procedures would obtain a higher price and greater overall benefit for the estate. Any other conclusion not only incorrectly assumes a disengaged or even indifferent bankruptcy court, but rests on pure speculation. The bankruptcy court was carrying out its independent judgment and obligation to promote the best sale price possible for the benefit of the estate and its creditors when it ordered the trustee to formulate and recommend procedures to sell the Kentucky and West Virginia properties separately or together. This Court rejects Hinkle's causation argument because it discounts and undervalues that independent judgment and

7

obligation.[4]

Hinkle's theory of causation is also purely speculative. The advantage of bundling the Kentucky and West Virginia properties was clear no later than July 3, 2006, when First South Investments wrote Judge Pearson expressing its interest in purchasing all of the assets for $2.5 million, an amount much greater than any combination of previous separate offers. By July 7, the bankruptcy court had "heard presentations . . . that at least two parties had expressed interest in acquiring all of the assets . . . for substantially more than the total of the highest existing bids for the [assets separately] . . . ." In re Buffalo Properties, LLC, No. 04-30404 (Bankr. S.D. W. Va. July 17, 2006). On July 17, it ordered the "Chapter 7 Trustee to propose an alternative procedure for the sale of all, or separate parts, the assets of the debtor." Id. With those new procedures in place, Hinkle bid $500,000 for the Kentucky wells and a third party bid $7 million for the Kentucky and West Virginia wells together. In short, a third-party simply outbid Hinkle, and that should put an end to the claim that Defendants caused Hinkle's injury. Hinkle conflates a chain of speculation and causation when it still argues that it was engaged in negotiations before the appearance of other bidders and would have finalized an agreement with the trustee (had Elk River not submitted its own bid), that requisite notice would have been given, that no other bidders would have appeared, and that the bankruptcy court would have approved the sale. The court rejects Hinkle's speculation, and will grant summary judgment as to Hinkle's tortious interference, legal malpractice and breach of fiduciary duty claims.

---

[4]Hinkle's own conduct contradicts its *pro forma* theory of bankruptcy court approval. On June 9, 2006, Hinkle submitted an upset bid for $455,000. If, as Hinkle presumes, the bankruptcy court was a disinterested bystander, it would have approved that upset bid as a matter of course.

8

## III.

Hinkle claims that Defendants (except for Chincheck) converted its $5000 retainer fee. This claim fails because according to the uncontradicted evidence Hinkle's retainer remains in Bowles Rice's trust account, and Hinkle has not demanded its return.

In West Virginia, conversion is any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights. Rodgers v. Rodgers, 399 S.E.2d 664, 677 (W. Va. 1990); Miami Coal Co. v. Hudson, 332 S.E.2d 114, 121 (W. Va. 1985). It is not necessary that the wrongdoer apply the property to his own use. Miami Coal, 332 S.E.2d at 121. Conversion may be proved in three ways: (1) by a tortious taking; (2) by any use or appropriation to the use of the defendant indicating a claim of right in opposition to the rights of the owner; or (3) by a refusal to give up the possession to the owner on demand. Shamblin's Ready Mix, Inc. v. Eaton Corp., 819 F.2d 1139 (4th Cir. 1987) (unpublished) (citing Haines v. Cochran Bros., 26 W. Va. 719, 723-24 (1885)).

Over two years have passed since Bowles Rice withdrew from representation of Hinkle. Bowles Rice, through its agreement with Hinkle, promised that any remainder of Hinkle's $5000 would be returned once all legal fees were paid in full. According to Defendants' brief, Bowles Rice has not billed Hinkle for services, yet still keeps the $5000 in a trust account. (Defs.' Reply Supp. Summ. J. 9.) The instant litigation apparently froze Bowles Rice's billing process.

Clearly, Bowles Rice's initial acceptance of the $5000 was not conversion; both parties voluntarily entered the transaction. Conversion could only occur at some later date, when Bowles Rice committed a distinct act of wrongful dominion. Yet no such act has occurred because Hinkle has apparently never requested the return of the money. As a result, Bowles Rice has merely left the money in the trust account. The court will, therefore, grant the defendants'

9

motion for summary judgment as to conversion of the $5000 retainer fee.[5]

## IV.

Hinkle also claims that Defendants converted information which they used in negotiating the Elk River contract. This claim fails because West Virginia has not recognized an action for conversion of an "unmerged" intangible property right.

Federal courts sitting in diversity must apply the governing state law, and when necessary, predict how the state's highest court would decide an unsettled issue. Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co., 514 F.3d 327, 329 (4th Cir. 2008) (applying "generally accepted principles of insurance law" when West Virginia had not addressed a particular issue). In this case, West Virginia has not directly addressed whether it recognizes an action for conversion of intangible property.[6] The court assumes without deciding that when confronted with this issue West Virginia courts would follow the generally accepted majority approach that has allowed conversion of intangible rights merged within a document. Under this approach, Hinkle's claim for conversion of confidential and proprietary information must fail because its information is not an intangible property right merged within a document.

As one judge on the Fourth Circuit has noted, "[t]he limitation on the tort of conversion

---

[5]However, it appears from the contract between Hinkle and Bowles Rice that Bowles Rice is obligated to return the fee to Hinkle in the absence of any bill for legal fees. As Hinkle states on brief, Hinkle is entitled to the money "under the agreement." (Pl.'s Mem. Opp'n 81.) Since Hinkle's entitlement to the retainer fee sounds in contract, not tort, this memorandum opinion and accompanying order are entered without prejudice to any contractual claim Hinkle may bring regarding Bowles Rice's obligations under the agreement.

[6]West Virginia courts have alluded to the potential for such an action, but these references only appear in the context of covenants not to compete. See Reedy v. Cmty. Health Found. of Man, 298 S.E.2d 906, 912 (W. Va. 1982) (noting that "[i]nformation, or 'trade secrets,' present a high risk of unfair conversion by an employee"); see also Wood v. Acordia of W. Va., Inc., 618 S.E.2d 415, 421 (W. Va. 2005) (citing Reedy for the proposition that "conversion by an employee of 'trade secrets or customer lists' are likely to injure the employer's business").

to tangible property has been gradually relaxed so that some courts have also come to permit actions involving documents in which intangible property rights have been merged, such as with a check, a promissory note, or a stock certificate." Fed. Ins. Co. v. Smith, 63 Fed. Appx. 630, 637 (4th Cir. 2003) (Traxler, J., dissenting). Since the document "symbolizes or embodies the right to property," conversion of the document includes conversion of the intangible rights represented in the document. Id. However, this evolution "has largely stopped with the kind of intangible rights merged in or identified with a document." Id. The Restatement Second of Torts also recognizes this cause of action,[7] and a majority of jurisdictions follow this approach.[8]

Given this majority approach, the court assumes without deciding that when confronted with this issue West Virginia courts would allow an action for the conversion of intangible rights merged within a document.[9] However, even assuming this recognition, Hinkle's claim fails because it alleges conversion of "confidential and proprietary *information*," not any tangible chattel, nor any intangible right customarily merged in a document. (Am. Compl. ¶ 86.)

---

[7]Section 242 of the Restatement Second recognizes an action for the conversion of intangible property when the converter "effectively prevents the exercise of intangible rights of the kind customarily merged in a document . . . even though the document is not itself converted." Restatement (Second) of Torts § 242(2) (1965). The drafters do not precisely define "merger," but the comments reveal that the scope of this action was limited to those intangible rights traditionally embodied in a legal document that evidences those rights. Such intangible rights include "promissory notes, bonds, bills of exchange, share certificates, and warehouse receipts, whether negotiable or non-negotiable." Restatement (Second) of Torts § 242 cmt. b. Intangible rights not merged within a document include "an ordinary debt not represented by a document," business goodwill, or a customer list. Restatement (Second) of Torts § 242 cmt. f.

[8]See Courtney W. Franks, Comment, Analyzing the Urge to Merge: Conversion of Intangible Property and the Merger Doctrine in the Wake of Kremen v. Cohen, 42 Hous. L. Rev. 489, 518-522 (2005). Virginia is part of this majority; it recognizes conversion of intangible rights that "arise from or are merged with a document, such as a stock certificate, promissory note, or bond." United Leasing Corp. v. Thrift Ins. Corp., 440 S.E.2d 902, 906 (Va. 1994).

[9]The court notes that West Virginia adheres to the "longstanding theory that a common law practice will remain unless supplanted by statute or later court decision." Miller v. Jeffrey, 576 S.E.2d 520, 523 (W. Va. 2002).

(emphasis added). Hinkle claims this information consisted of "secret information concerning mineral leases, production figures and projections, of and concerning Kentucky oil and gas wells in general and the 19 oil and gas wells" that Hinkle desired. Id. Hinkle claims that Bowles Rice converted this information for their own use, to inform Elk River's bid. Id. However, the intangible property right that Hinkle alleges Bowles Rice converted is not an intangible obligation. Rather, it is information that Hinkle gathered in preparation for purchasing the Kentucky wells. This information, albeit in document form, is not an intangible property right *merged* in a document like a promissory note or a stock certificate. It is more akin to business goodwill or customer lists, property that the majority view expressly excludes from a cause of action for conversion of intangible property rights. See Restatement (Second) of Torts § 242 cmt. f (1965). Therefore, the court grants Defendants' Motion for Summary Judgment as to conversion of confidential information.[10]

---

[10]In so holding, the court is aware that some jurisdictions now only follow the majority approach "in spirit" and have relaxed the merger requirement to allow conversion of intangible property rights that are simply represented or identified in a document. See, e.g., Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc., 42 F. Supp. 2d 423, 438-39 (D. Del. 1999) (recognizing, under Delaware law, a claim for conversion of proprietary information based on "plans, technology, designs, and specifications"); Colton, McMichael, Lester, Auman, Visnovske, Inc. v. Mueller, 896 S.W.2d 741, 744 (Mo. Ct. App. 1995) (allowing a claim for conversion of engineering plans); Conant v. Karris, 520 N.E.2d 757, 791-92 (Ill. App. Ct. 1987) (recognizing a claim for conversion of confidential information). But given West Virginia's adherence to its common law roots, the court cannot make the compound assumption that when presented with this issue West Virginia courts would not only follow the majority approach and include intangible rights within the scope of conversion, but would also relax those requirements and allow conversion for intangible rights that are merely identified in a document. A better prediction is that when confronted with this issue, West Virginia, like Virginia, will follow the majority approach. See Fed. Ins. Co. v. Smith, 63 Fed. Appx. 630, 638 (2003) (Traxler, J., dissenting) ("[W]here the rights at issue amount to undocumented intangible property rights–those that are not merged with a document and so cannot be physically possessed–Virginia's Supreme Court has held that they cannot be validly claimed in an action for conversion.").

## VI.

For the foregoing reasons, the Defendants' Motion for Summary Judgment will be granted as to all claims. However, Hinkle may file an amended complaint within ten days asserting any claim that does not require Hinkle to prove that Defendants caused its failure to obtain the Kentucky wells.[11]

ENTER: This 17th day of September, 2008.

_____
UNITED STATES DISTRICT JUDGE

---

[11] The court expresses no opinion about whether such a claim exists.